# IN THE COURT OF APPEALS OF TENNESSEE AT KNOXVILLE
## August 20, 2019 Session

## DAVID CAMPBELL v. CITY OF CHATTANOOGA

**Appeal from the Chancery Court for Hamilton County**
**No. 18-0163  Jeffrey M. Atherton, Chancellor**

———————————————————————

### No. E2018-02010-COA-R3-CV

———————————————————————

This appeal arises from the Chattanooga Police Department's decision to terminate Appellant's employment as a police officer.  The administrative law judge affirmed the decision to terminate Appellant's employment.  On appeal, the Hamilton County Chancery Court affirmed the ALJ's ruling.  Finding no error, we affirm the decision of the Chancery Court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed and Remanded**

KENNY ARMSTRONG, J., delivered the opinion of the court, in which CHARLES D. SUSANO, JR., and THOMAS R. FRIERSON, II, JJ., joined.

Janie Parks Varnell, Chattanooga, Tennessee, for the appellant, David Campbell.

Phillip A. Noblett, City Attorney, and Keith J. Riesman, Assistant City Attorney, Chattanooga, Tennessee, for the appellee, City of Chattanooga.

## OPINION

## I. Background

David Campbell ("Appellant") was a police officer with the Chattanooga Police Department ("CPD"). On May 29, 2016, Mr. Campbell was dispatched to an apartment complex on report of a fight there. When Mr. Campbell arrived on scene, there were approximately 20-30 people in the parking lot. Mr. Campbell and other officers directed the crowd to clear the parking lot. While Mr. Campbell was giving these instructions, Hanson Melvin, a resident of the complex, walked by Mr. Campbell, and Mr. Campbell initiated an encounter with him. Mr. Melvin was known to Mr. Campbell because, on several previous occasions, Mr. Campbell had stopped Mr. Melvin for various alleged offenses, including driving without a valid driver's license. Mr. Melvin was walking toward a silver vehicle with his friend, Coheleach Holmes. During this interaction, Mr. Campbell handcuffed Mr. Melvin and arrested him for disorderly conduct. Mr. Campbell placed Mr. Melvin in the back of his police car and took him to jail.

On June 5, 2016, Mr. Melvin filed a complaint against Mr. Campbell with CPD Internal Affairs Department ("IA"). In his complaint, Mr. Melvin alleged that Mr. Campbell harassed and falsely arrested him. CPD opened an investigation under case number 2016-14, with Sergeant Jeff Gaines as the lead investigator. The scope of the investigation was Mr. Campbell's alleged violations of: (1) ADM-01 Code of Conduct—Harassment;[1] and (2) ADM-16 Code of Conduct—False Arrest.

During the investigation, Sergeant Gaines interviewed: (1) Mr. Melvin; (2) Mr. Campbell; and (3) Officers Jeffrey Rahn and Dustin Finley, who were on the scene during the May 29, 2016 call. Sergeant Gaines also discovered that Mr. Melvin's license was revoked. In addition, Sergeant Gaines learned that Mr. Melvin had several arrests and citations for violation of the Driver's License law. The investigation revealed that there were no vehicles registered to Mr. Melvin; however, Sergeant Gaines discovered that a 2014 silver Chevrolet, which met the description of the vehicle Messrs. Melvin and Holmes were walking toward on the night of Mr. Melvin's arrest, was registered to Mr. Holmes. Sergeant Gaines concluded that it was "probable that the vehicle in question that Mr. Melvin was [walking] towards belonged to Mr. Holmes and more likely Mr. Holmes was going to be the driver." Before submitting his report, Sergeant Gaines also reviewed dash-camera video footage from the night of the incident. On August 16, 2016, Sergeant Gaines submitted his report. On August 30, 2016, Lieutenant Pedro Bacon, who assisted in the investigation, also submitted a "Conclusion of Fact" report.

Deputy Chief of Staff David Roddy, Captain Zach McCullough, and Assistant

---

[1] As discussed, *infra*, the ALJ found that there was no reasonable basis to sustain the harassment claim. This holding is not appealed.

Chief Eric Tucker reviewed Sergeant Gaines' findings. Deputy Chief of Staff Roddy and Assistant Chief Tucker recommended sustaining the false arrest charge but not the charge of harassment. Captain McCullough did not recommend sustaining either charge. On January 11, 2017, Mr. Campbell received a letter advising him that a disciplinary hearing concerning IA case number 2016-14 would be held on February 10, 2017.

In addition to being investigated for the false arrest violation, Mr. Campbell was also under CPD investigation for alleged violations of OPS-1—Operation of Motor Vehicle. On January 26, 2016, under IA case number 2015-24, Mr. Campbell was found to have violated OPS-1 for "reckless use of his motor vehicle by driving at excessive speeds . . . and causing physical contact with a suspect." He was suspended, without pay, for seven days, and was also removed from his Field Training Officer ("FTO") position.[2] Thereafter, CPD periodically monitored Mr. Campbell's driving habits by reviewing his in-car videos. To this end, on August 17, 2016, Lieutenant (now Captain) Jerri Sutton reviewed Mr. Campbell's in-car video footage from July 21, 2016. From the video, Captain Sutton determined that Mr. Campbell again violated OPS-1 when he operated his vehicle at speeds up to 92 miles per hour without activating his emergency equipment. Captain Sutton further found that "[Mr.] Campbell was going to back up an officer who had not requested emergency assistance. I[n] the video, [Mr.] Campbell can be seen driving to the right of traffic that he was passing then eventually turning left onto a side road before deactivating his camera." Captain Sutton reported her findings to Assistant Chief Tucker, who instigated another investigation led by Lieutenant Craig Joel.

For his investigation, Lieutenant Joel reviewed portions of six-to-eight months of randomly chosen video from Mr. Campbell's assigned police car. Lieutenant Joel found several policy violations on Mr. Campbell's part. Lieutenant Joel noted instances where Mr. Campbell drove, in populated areas, at excessive speeds that, at times, reached over 100 miles per hour. During some of these instances, Mr. Campbell did not activate his emergency lights and/or siren. Mr. Campbell also passed vehicles on the right side, on curves, and over double-yellow lines. Lieutenant Joel chose four of the most egregious driving examples to show to Mr. Campbell at a meeting on September 16, 2016, where Mr. Campbell's attorney was also present. During this meeting, Mr. Campbell was given the opportunity to explain his driving. After the meeting, Lieutenant Joel sent a memorandum of his findings to Assistant Chief Tucker and Captain Sutton. Therein, Lieutenant Joel recommended that the case "be reviewed more in depth up the chain of command [because Mr. Campbell's] driving behaviors [were] a pattern unaltered by negative discipline," i.e. Mr. Campbell's previous unpaid suspension and removal from his FTO position.

---

[2] Chief Fred Fletcher testified at the administrative hearing that FTOs are "senior, experienced, and trusted officers [who] are placed in charge of training officers post-academy in the field application of their classroom learning."

After reviewing Lieutenant Joel's report, Captain Sutton found that Mr. Campbell violated OPS-1. Assistant Chief Tucker concurred and recommended a hearing to determine appropriate disciplinary action. This hearing was consolidated with the disciplinary hearing on the false arrest and harassment charges.

On February 10, 2017, Chief Fred Fletcher presided over the consolidated disciplinary hearing. Mr. Campbell attended with his attorney. Several police officers, who participated in the investigations, were also present. At the beginning of the hearing, Chief Fletcher explained that the hearing was for Mr. Campbell to clarify his actions and behavior on the night he arrested Mr. Melvin as well as his reasons for the reckless driving. As discussed, *infra*, Chief Fletcher and other investigating officers questioned Mr. Campbell concerning both his interactions with Mr. Melvin, and the video footage of his driving. Mr. Campbell was given the opportunity to refute the charges.

Following the hearing, on February 16, 2017, Chief Fletcher announced his decision to sustain the charges against Mr. Campbell, i.e. violation of: (1) ADM-01 Code of Conduct—Harassment; (2) ADM-16 Code of Conduct—False Arrest; and (3) OPS-1 Operation of Motor Vehicle. Based on these charges and CPD's previous disciplinary action against Mr. Campbell, by letter of February 20, 2017, Chief Fletcher notified Mr. Campbell of CPD's decision to terminate his employment, effective February 16, 2017.

Mr. Campbell appealed CPD's decision to Administrative Law Judge ("ALJ") Michael Begley, who heard the appeal on June 29 and 30, 2017. The following individuals testified at the hearing: (1) Chief Fletcher; (2) Deputy Chief of Staff Roddy; (3) Sergeant Gaines; (4) Lieutenant Joel; (5) Captain Sutton; (6) Assistant Chief Tucker; (7) Officer Finley; (8) Officer Rahn; and (9) Mr. Campbell. In addition, twenty-three exhibits were entered into evidence. By order of January 26, 2018, ALJ Begley concluded that Chief Fletcher did not have a reasonable basis to sustain the harassment allegation, *see* footnote 1. However, the ALJ sustained the termination of Mr. Campbell's employment on his finding that CPD had a reasonable basis to sustain both the false arrest allegation and the OPS-1 violations.

Mr. Campbell appealed the ALJ's order to the Chancery Court of Hamilton County ("trial court").[3] By order of October 12, 2018, the trial court found substantial

---

[3] We note that Mr. Campbell's initiating pleading in the trial court was styled as a "First Application for Petition for Writ of Certiorari." In ***Davis v. Shelby County Sheriff's Department***, the Tennessee Supreme Court explained that

> in 1988, the General Assembly amended the language of section 27-9-114 [of the Tennessee Code] to read, in pertinent part, "Judicial review of decisions by civil service boards of a county or municipality which affects the employment status of a county or city civil service employee shall be in conformity with the judicial review standards under Tennessee Code Annotated, Section 4-5-322, of the [UAPA]." 1988 Tenn. Pub.

and material evidence to uphold the ALJ's decision to sustain the false arrest and OPS-1 allegations and thus, affirmed the termination of Mr. Campbell's employment. Mr. Campbell appeals.

## II. Issues

Mr. Campbell raises several issues for review. However, we perceive the dispositive issues are:

1. Whether the trial court erred in affirming the ALJ's ruling that CPD had a reasonable basis to sustain Mr. Campbell's false arrest and OPS-1 violations.

2. If so, whether the trial court erred in upholding the ALJ's ruling that CPD had a reasonable basis to terminate Mr. Campbell's employment.

## III. Standard of Review

Our review of the ALJ's decision is governed by the Uniform Administrative Procedures Act ("UAPA"). Tenn. Code Ann. § 27-9-114(b)(1); *City of Memphis v. Civil Serv. Comm'n of Memphis*, 238 S.W.3d 238, 242 (Tenn. Ct. App. 2007). The UAPA provides, in pertinent part:

(a)(1) A person who is aggrieved by a final decision in a contested case is entitled to judicial review under this chapter, which shall be the only available method of judicial review. . . .

\*\*\*

(h) The court may affirm the decision of the agency or remand the case for further proceedings. The court may reverse or modify the decision if the rights of the petitioner have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:

(1) In violation of the of constitutional or statutory provisions;

---

Acts, ch. 1001. Thus, the legislature deleted the provision requiring common law writ of certiorari review and replaced it with the current provision providing for judicial review under the UAPA.

*Davis v. Shelby Cty. Sheriff's Dep't*, 278 S.W.3d 256, 262 (Tenn. 2009). Under *Davis*, Mr. Campbell's initiating pleading should have been styled, "Petition for Judicial Review." This error does not preclude our review of the appeal, and we note it only for the purpose of edification.

(2) In excess of the statutory authority of the agency;

(3) Made upon unlawful procedure;

(4) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or

(5)(A) Unsupported by evidence that is both substantial and material in the light of the entire record.

> (B) In determining the substantiality of evidence, the court shall take into account whatever in the record fairly detracts from its weight, but the court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact.

(i) No agency decision pursuant to a hearing in a contested case shall be reversed, remanded or modified by the reviewing court unless for errors that affect the merits of such decision.

Tenn. Code Ann. § 4-5-322. In *City of Memphis*, this Court explained that

> [u]pon confirming that an agency has employed the proper legal principles in the case under review, this Court must then consider the disputed factual findings and address whether the agency had a reasonably sound basis for making those findings. *See McEwen v. Tenn. Dept. of Safety*, 173 S.W.3d 815, 820 (Tenn. Ct. App. 2005). Like the trial court, this Court applies the substantial and material evidence standard in reviewing the agency's findings of fact. *Bobbitt v. Shell*, 115 S.W.3d 506, 509-10 (Tenn. Ct. App. 2003). Substantial and material evidence is "such relevant evidence as a reasonable mind might accept to support a rational conclusion" and to furnish a reasonably sound basis for the decision under consideration. *City of Memphis v. Civil Serv. Comm'n*, 216 S.W.3d 311, 316 (Tenn. 2007) (quoting *Jackson Mobilphone Co. v. Tenn. Pub. Serv. Comm'n*, 876 S.W.2d 106, 110-11 (Tenn. Ct. App. 1993)); *Dickson v. City of Memphis Civil Serv. Comm'n*, 194 S.W.3d 457, 464 (Tenn. Ct. App. 2005); *Pruitt v. City of Memphis*, No. W2004-01771-COA-R3-CV, 2005 WL 2043542, at *7 (Tenn. Ct. App. Aug. 24, 2005); *Bobbitt*, 115 S.W.3d at 510.

> As directed by the statute, we take into account whatever in the record fairly detracts from the weight of the evidence, but we may not

substitute our own judgment on questions of fact by re-weighing the evidence. *See* Tenn. Code Ann. § 4-5-322(h)(5)(B). When the agency conducts a hearing and can evaluate the witnesses as they testify, this Court gives the tribunal's credibility determinations great weight. ***Pruitt***, 2005 WL 2043542, at *7. Moreover, the substantial and material evidence standard does not justify reversal of an administrative decision only because the evidence could also support another result. ***Martin v. Sizemore***, 78 S.W.3d 249, 276 (Tenn. Ct. App. 2001). Rather, we may reject an administrative determination only if a reasonable person would necessarily arrive at a different conclusion based on the evidence. ***Id.***

Likewise, Tennessee Code Annotated Section 4-5-322(h)(4) permits a reviewing court to modify or reverse an administrative decision if it is "[a]rbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion." Tenn. Code Ann. § 4-5-322(h)(4). A decision unsupported by substantial and material evidence is arbitrary and capricious. ***City of Memphis***, 216 S.W.3d at 315. Yet, a clear error of judgment can also render a decision arbitrary and capricious notwithstanding adequate evidentiary support. ***Id.*** at 316. A decision is arbitrary or capricious if it "is not based on any course of reasoning or exercise of judgment, or . . . disregards the facts or circumstances of the case without some basis that would lead a reasonable person to reach the same conclusion." ***Id.*** (quoting ***Jackson Mobilphone***, 876 S.W.2d at 110-11).

***City of Memphis***, 238 S.W.3d at 243. With the foregoing in mind, we turn to address the issues.

## IV. Analysis

### A. ADM-16 Violation: False Arrest

Mr. Campbell argues that the ALJ's decision to sustain the false arrest charge is not supported by substantial and material evidence. The charge against Mr. Campbell arises from his alleged violation of CPD policy ADM-16, which provides, in pertinent part:

### I. Policy

A. All employees—whether on or off duty—shall be governed by reasonable rules of good conduct and behavior and shall not commit any wrongful, malicious, or criminal act which may bring reproach or discredit upon themselves, their fellow employees, the Chattanooga Police

Department, or the City of Chattanooga.

***

C.  Nothing in this order or in any other general order shall be interpreted to preclude or prohibit the Chief of Police from tailoring appropriate disciplinary action to fit the circumstances of any violation of policy, rule or order of the Department or any violation of policy, rule or order of the City.  The Chief of Police may impose any level of disciplinary action authorized by the Chattanooga City Code.

## II. Conduct in General

A.  Submitting false reports

Written and oral reports submitted by employees shall be truthful and complete, and no employee shall knowingly enter or cause to be entered inaccurate, false, misleading or improper information, or submit reports containing material omissions.

B.  Employee Conduct During Internal Investigation

Employees shall answer questions truthfully, submit written statements and participate in recorded interviews during internal investigations related to the employee's duties or fitness for duty.  Failure to answer such questions and cooperate with the investigation may form the basis for disciplinary action and may result in dismissal from the department.  The intentional misrepresentation of a material fact during an internal investigation may result in the dismissal of the employee from the Department.

***

S.  Unbecoming Conduct

1. Employees shall conduct themselves at all times—both on and off duty—in such a manner as to reflect favorably on the Department.  Conduct unbecoming a public employee includes conduct that is unlawful and/or brings the Department into disrepute, reflects discredit upon the employee as a member of the Department, or impairs the operation or efficiency of the Department or officer.

Concerning the false arrest charge, the ALJ found, in relevant part:

- 8 -

9. [Mr. Campbell] . . . stated to Mr. Melvin in a casual tone, "Hey man, you got your license back yet? You working on it?" Mr. Melvin responded that it was none of [Mr. Campbell]'s business. Mr. Melvin had committed no violation at this point.

10. After a brief pause, [Mr. Campbell]'s tone became angry. He became highly agitated, demanding that Mr. Melvin come back and show his identification because they were on government property and [Mr. Campbell] was a government official. Mr. Melvin stated that all [Mr. Campbell] did was harass him and pick on him and that he was leaving.

11. Further escalating the situation, [Mr. Campbell] then asked Mr. Melvin to put his hands on the vehicle, eventually grabbing one of Mr. Melvin's arms and placing it on the vehicle. As a result of [Mr. Campbell]'s escalating actions, Mr. Melvin became irate and began yelling. Two other officers walked over to assist [Mr. Campbell] in handcuffing Mr. Melvin.

12. Once in handcuffs, Mr. Melvin was arrested for disorderly conduct, was led to [Mr. Campbell]'s patrol car, and was placed in the back seat.

Sergeant Gaines' internal investigation report for IA case number 2016-14 was admitted as Exhibit 7 to the ALJ hearing was. Therein, Sergeant Gaines summarized his interview with Mr. Campbell concerning Mr. Campbell's position on the false arrest incident, to-wit:

While clearing the area, [Mr. Campbell] observed Mr. Melvin walking by him heading towards a vehicle with another person. Knowing that he didn't have a license, he asked him if he had gotten his license back. Mr. Melvin responded back with "that's none of your business." [Mr. Campbell] did not know if Mr. Melvin had been involved in the call but did see him approach a vehicle and knew he didn't have a license. When [Mr. Campbell] asked Mr. Melvin for his ID, he patted his pants and stated he did not have it on him. When he asked Mr. Melvin for his SSN, he stated that he was harassing him. Mr. Melvin was getting louder when speaking and was becoming agitated. . . . Mr. Melvin continued to argue with [Mr. Campbell] and had something in his hands. After ordering him 4 times to show what was in his hands, [Mr. Campbell] grabbed Mr. Melvin's hand that had the object in it, put his hand on Mr. Melvin's back and placed him on the car. . . . At this time, Mr. Melvin was being detained for failing to show what he had in his hands and if he possessed a valid DL. After handcuffing Mr. Melvin, he began hollering and screaming. Mr. Melvin was taken to a police car where he was searched and an ID was not found. [Mr.] Melvin continuously yelled that they didn't have the right to do what

- 9 -

they are doing to him. He was told at this time he was being arrested for disorderly conduct due to the people being out there and him causing a scene.

Lieutenant Bacon's Conclusion of Fact was admitted as Exhibit 20 to the ALJ hearing. Therein, Lieutenant Bacon stated that

[o]n the night in question [Mr.] Melvin was merely walking down the sidewalk when he was asked a question by [Mr.] Campbell about his license. He replied none of [Mr.] Campbell's business since he was not driving a vehicle and [Mr.] Campbell was only casually inquiring (not lawfully). The situation went from this question to [Mr.] Campbell demanding to see [Mr.] Melvin's identification for some reason not really known even though he had a prior knowledge of [Mr.] Melvin's identity. The situation further heightens with [Mr.] Campbell impeding [Mr.] Melvin's ability to go on his way[,] which eventually lead to [Mr.] Melvin's arrest for Disorderly Conduct. It is clear in the audio of the ICVAR system that Hanson Melvin was quite calm for most of this encounter until the realization of the impending arrest. [Mr.] Campbell[,] however, goes from being friendly, to being authoritative and finally the arrest of [Mr.] Melvin after the 'none of your business' statement[,] which drew more attention than [Mr.] Melvin's actions. This case was True Billed in Grand Jury; however[,] it was dismissed from Criminal Court (Judge Pool) on August 26th, 2016.

Exhibit 12 to the ALJ hearing was the audio recording from Mr. Campbell's disciplinary hearing on February 10, 2017. In response to the question of when Mr. Melvin exhibited the behavior necessary to develop probable cause for a disorderly conduct arrest, Mr. Campbell stated:

**A:** Right as I was placing cuffs on him.

**Q:** So it was as you were placing cuffs on him or after you placed cuffs on him?

**A:** Pretty much the same time.

**Q:** So why were you placing cuffs on him if he hadn't become disorderly yet?

**A:** To detain him because he was attempting to leave the scene in a vehicle.

- 10 -

**Q:** So he was pulling away from you and resisting your . . .

**A:** Commands, yes sir.

**Q:** Wait, he was attempting to leave the scene…

**A:** In an illegal manner.

At the ALJ hearing, Mr. Campbell testified that the disciplinary hearing was a "blur," and he could not remember his answers to certain questions during that hearing. Nonetheless, Mr. Campbell opined that his statement to Sergeant Gaines during the IA investigation would be the "most correct" account because this statement was taken "closest to the incident." Regardless, in both his IA interview and his statements at the disciplinary hearing, Mr. Campbell conceded that Mr. Melvin did not become disorderly until Mr. Campbell placed him in handcuffs.

At the ALJ hearing, Chief Fletcher testified that after reviewing the results of the internal investigation, he was concerned with several aspects of Mr. Campbell's arrest of Mr. Melvin for disorderly conduct, to-wit:

**Q:** . . . [C]oncerning Mr. Hanson Melvin, what was your concern about the timing of the reasons for arrest?

**A:** That's – there were a lot of concerns. And there's some statements that are made by [Mr.] Campbell on the, on the audio. But the – there was some confusion, and we talk about it at some length in the, in the disciplinary hearing about when he was detained and what he was detained for; but it appears that the actions that led to the decision to arrest for disorderly conduct didn't happen until after [Mr. Melvin] was physically detained. So there's some confusion about the application of that, that law and the decision behind its application.

**Q:** Well, why was that a concern as to the reasons for a stop?

**A:** Well, sure. Because it doesn't appear that the elements of the offense occurred until after the stop was made, so it's sort of a cart before the horse kind of thing.

**Q:** And is that – I mean, you have referenced false arrest to be sustained. What was your thinking in connection with that?

**A:** Was that they were not the elements of arrest, certainly, and that the vague and obtuse references to the elements all occurred after the

intervention by [Mr.] Campbell, which he did not offer a consistent or an adequate explanation for.

Tennessee Code Annotated section 39-17-305 sets out the *prima facie* elements for disorderly conduct, to-wit:

(a) A person commits an offense who, in a public place and with intent to cause public annoyance or alarm:

(1) Engages in fighting or in violent or threatening behavior;

(2) Refuses to obey an official order to disperse issued to maintain public safety in dangerous proximity to a fire, hazard or other emergency; or

(3) Creates a hazardous or physically offensive condition by any act that serves no legitimate purpose.

(b) A person also violates this section who makes unreasonable noise that prevents others from carrying on lawful activities.

Tenn. Code Ann. § 39-17-305.  Concerning the statutory definition of disorderly conduct, in his testimony before the ALJ, Chief Fletcher opined that Mr. Melvin's behavior on the night in question did not evidence a *prima facie* case for disorderly conduct.  Specifically, Chief Fletcher noted that: 1) Mr. Melvin did not engage in "fighting or in violent or threatening behavior," Tenn. Code Ann. § 39-17-305(a)(1); 2) Mr. Melvin was not "refus[ing] to obey an official order to disperse" but was, in fact, obeying the order to disperse by attempting to leave the parking lot when Mr. Campbell approached and detained him, Tenn. Code Ann. § 39-17-305(a)(2); and 3) Mr. Melvin did not create a "hazardous or physically offensive condition . . . ," Tenn. Code Ann. § 39-17-305(a)(3).  Concerning whether Mr. Melvin's conduct was in violation of Tennessee Code Annotated section 39-17-305(b), i.e. whether he made "unreasonable noise that prevent[ed] others from carrying on lawful activities," Mr. Campbell stated, *see supra*, that it was not until he handcuffed Mr. Melvin that Mr. Melvin "began hollering and screaming."[4]  Chief Fletcher testified that the reason he sustained the charge of false arrest against Mr. Campbell was that he did not believe that Mr. Melvin's behavior rose to the level of disorderly conduct so as to justify Mr. Campbell's actions.

From our review of the record, there is sufficient evidence to support CPD's decision concerning the false arrest charge.  Exhibit 23 to the ALJ hearing (Exhibit 1 at

---

[4] We note that during Mr. Campbell's testimony before the ALJ, he stated that Mr. Melvin started to become disorderly when Mr. Melvin "didn't . . . acknowledge [Mr. Campbell's] commands."

the trial court hearing), is the dash-camera video (with audio) of Mr. Campbell's interaction with Mr. Melvin on the night of Mr. Melvin' arrest. Therein, it appears that Mr. Melvin is walking towards a car when Mr. Campbell calls out to him and asks for his identification:

> **Mr. Campbell:** What's up, man? What's up, man?

> **Mr. Melvin:** What's up?

> **Mr. Campbell:** You got your license back yet? You workin' on it?

> **Mr. Melvin:** That's none of your business.

> **Mr. Campbell:** Huh?

> **Mr. Melvin:** That's none of your business.

At this point, Mr. Campbell becomes clearly frustrated; the tone of his voice changes, and he becomes confrontational. Mr. Melvin continues to walk away from Mr. Campbell, and the following verbal exchange occurs:

> **Mr. Campbell**: Get back here. Get back here and give me your ID.

> **Mr. Melvin:** That's none of your business.

> **Mr. Campbell:** Yeah, except that its government property, and I'm a government official, give me your ID.[5]

> **Mr. Melvin:** That's fine, you can have my ID. . . .

Mr. Melvin then checks his pockets but does not have his identification. The conversation continues:

> **Mr. Campbell:** . . . See I'm trying to play around and be nice . . . .

> **Mr. Melvin:** You bother me every time you see me, you harass me, I don't want to be bothered, I'm fixing to go . . . .

> **Mr. Campbell:** Put your hands on the car, put your hands on the car, put

---

[5] Mr. Campbell and other officers mistakenly believed that the apartment complex was a government housing complex. The officers later discovered that the complex was not government housing.

- 13 -

your hands on the car!

**Mr. Melvin:** What are you bothering me for?

**Mr. Campbell:** You're not listening to me. . . when I'm trying to give my lawful commands!

**Mr. Melvin:** What are you doing? You don't gotta get your hands on me, I'm fixing to get my hands on the car. Get your hand off me. What you doing?

**Mr. Campbell:** Let go of that [expletive] in your hand.

**Mr. Melvin:** You don't gotta cuss at me either. Don't use profanity around me . . . what are you doing? I'm moving the keys. This is unbelievable . . . I'm trying to go to the store, I don't understand. What, what are you doing? What are you doing man? Look, do you want me to get down? You aren't giving me no lawful commands. What are you doing?

**Mr. Campbell:** What's the point? I'm done giving you commands, you ain't listening.

**Mr. Melvin:** What are you doing? What are you doing? . . . I'm going to the store, man, you don't have to treat me like this. I'm a grown man . . . I was going to my car . . . You don't have to ask me about my license. It's none of your business, it ain't none of your business. I'm filing a report because you're always harassing me. . . .

From this Court's review, Mr. Melvin does not begin to yell and protest until Mr. Campbell grabs Mr. Melvin in an attempt to handcuff him. Until that point in the foregoing exchange, Mr. Melvin remains relatively calm. Although Mr. Melvin asks why he is being handcuffed, Mr. Campbell does not explain. With Mr. Melvin in the back of his police cruiser, Mr. Campbell continues to direct others to disperse. In the audio, Mr. Campbell is heard saying "[a]pparently people want to test my patience tonight and not listen to me," and "I can fit three [expletive] people in the back of my car." Mr. Campbell is also heard making the following comment to his fellow officers:

Hanson Melvin. I was just messing with him because I used to pull him over all the time because he never had a license. . . . [I said] "Man you got your license?" [And he said] "that ain't none of your business." Oh except that it is cause you're on government housing property. You want to get stupid? I can get a lot [expletive] stupider.

- 14 -

During the ALJ hearing, Mr. Campbell did not deny making the foregoing statements. The audio continues after Mr. Campbell is driving Mr. Melvin to jail. Only then does Mr. Campbell inform Mr. Melvin that he is being arrested for disorderly conduct.

Based on the evidence, the ALJ concluded, in pertinent part:

8. Chief Fletcher's decision to uphold the allegation of false arrest was reasonable because [Mr. Campbell]'s own inappropriate actions led to Mr. Melvin becoming disorderly. . . .

11. . . . [W]hen Mr. Melvin replied "none of your business," the interaction should have ended. . . .

15. . . . [Mr. Campbell] caused the disorder.

16. [Mr. Campbell]'s "detention" of Mr. Melvin began moments after Mr. Melvin told [Mr. Campbell] it was none of [Mr. Campbell]'s business whether Mr. Melvin had his license back or not. As soon as [Mr. Campbell] responded demanding to see Mr. Melvin's license because Mr. Melvin was on government property, he was being "detained" as he was clearly not free to leave. Nothing about the circumstances of the encounter had changed at this point other than Mr. Melvin's rightful refusal to answer [Mr. Campbell]'s question. The only change was [Mr. Campbell]'s anger at Mr. Melvin's response. Mr. Melvin's conduct from this point forward was in direct response to [Mr. Campbell]'s inappropriate detention and behavior.

18. For the aforementioned reasons, Chief Fletcher had a reasonable basis to sustain the false arrest allegation.

In its final order, the trial court concluded that

[t]he ALJ weighed the evidence before it, and reached the conclusion that [Mr.] Campbell caused Mr. Melvin to become disorderly, and therefore did not have a basis for the arrest until after he had already attempted to arrest Mr. Melvin. This made [Mr.] Campbell's arrest of Mr. Melvin a false arrest under [ADM]-16. . . . The [c]ourt finds such a conclusion reasonable in light of the evidence.

From our review, we agree with both the ALJ and the trial court that Mr. Campbell violated CPD policy, *see* ADM-16, by falsely arresting Mr. Melvin. The audio and visual evidence clearly demonstrates that it was Mr. Campbell who exacerbated the situation. When Mr. Campbell confronted Mr. Melvin and asked for his identification,

- 15 -

Mr. Melvin was attempting to comply with the on-scene officers' orders to disburse and leave the parking lot. Mr. Campbell should have allowed Mr. Melvin to leave; however, he detained him under the guise of needing to see his identification. Throughout the confrontation, Mr. Melvin continued to question Mr. Campbell as to why he was detaining him, but Mr. Campbell gave no answer. It appears that he thought Mr. Melvin disrespected him by even questioning why Mr. Campbell stopped him. At any point, Mr. Campbell could have diffused the situation by allowing Mr. Melvin to continue on his way or by answering his questions. Instead, he grabbed Mr. Melvin and handcuffed him. It was only at this point, i.e. after the actual arrest, that Mr. Melvin's behavior could possibly be construed as disorderly. Therefore, from our review, the record contains substantial and material evidence to support the ALJ's finding that Chief Fletcher had a reasonable basis to sustain the false arrest allegation.

## B. OPS-1 Violation

The second issue concerns Mr. Campbell's violations of OPS-1, which provides, in pertinent part:

## II. Operation of Police Vehicles in Response to Emergency Calls

C. General Procedures for Emergency Operation other than in a Pursuit

1. On any call for service the officer must evaluate the facts and circumstances and make the determination whether sufficient information exists to justify a conclusion that an emergency situation exists which requires emergency operation for the protection of persons. When responding to **any** call for service officers shall respond as **QUICKLY AND SAFELY** as possible with due regard to public safety.

2. The primary emergency equipment shall be engaged at all times during emergency operation to signal the other users of the roadway that an emergency condition exists and the right-of-way should be relinquished to the emergency vehicle.

***

5. During emergency operation, the emergency vehicle will pass other vehicular traffic on the left. **ONLY UNDER RARE CIRCUMSTANCES, WHEN SAFETY HAS BEEN ASSURED, WILL A VEHICLE BE PASSED ON**

**THE RIGHT.** Motorists are required by law to move to the right at the approach of sirens. A police car should not follow another emergency vehicle under emergency conditions too closely. A motorist may yield to the right for the first emergency vehicle and then after being passed may swerve into the second.

6. During emergency operation, the following procedures will be followed with regard to vehicle speed:

   a. While passing through a stop light, stop sign, or a controlled intersection, the emergency vehicle shall slow to a reasonably safe speed, then proceed with due regard and caution for the safety of all persons using the roadway.

   b. The emergency vehicle shall be operated at a reasonable, prudent and safe rate of speed commensurate with the legal speed limit and existing traffic conditions.

   c. The emergency vehicle shall be operated at a slower speed whenever traffic conditions, pedestrian traffic, weather conditions or highway conditions necessitate such action in order to maintain safety.

   d. When responding to **any** call for service officers shall respond as **QUICKLY AND SAFELY** as possible with due regard to public safety.

7. The blue lights alone may be used for a short duration when responding to "in progress" emergency calls only when nearing the scene and only when rules of the road are not being violated.

(Emphasis in original).

Regarding Mr. Campbell's OPS-1 violations, the ALJ found:

26. The first example [of a violation] occurred on February 18, 2016; approximately 3 weeks after [Mr. Campbell]'s 7 day suspension for

- 17 -

previously violat[ing] the OPS-1 policy. [Mr. Campbell] can be seen driving excessive speeds without utilizing lights or sirens, both of which are required to be on any time an officer seeks to violate Tennessee driving laws. [Mr. Campbell] activates his lights and/or siren at varying times during the video, but can be seen excessively speeding throughout. [Mr. Campbell] had not been dispatched to the particular call. His top speed reached 108 mph at one point, and he can be seen driving 71 mph in a 40 mph zone without using his siren. [Mr. Campbell] claims he heard a call that more officers were needed at a scene and responded.

27. The second example occurred on July 13, 2016. [Mr. Campbell] can again be seen driving at excessive speeds with no justification in the patrol activity log or elsewhere. At the hearing, [Mr. Campbell] testified that he was responding to a call about a suspicious person.

28. The third example occurred on July 14, 2016. [Mr. Campbell] can be seen driving 87 mph in a 30 mph residential area and 116 mph in a 40 mph zone. [Mr. Campbell] was not dispatched to this call about a non-injury wreck where officers were already on the scene, according to Lt. Joel. [Mr. Campbell] can be seen passing another officer who is not responding to the call. [Mr. Campbell] claimed the wreck did involve injuries, including an unconscious driver that required extraction.

29. The fourth and final example occurred on August 5, 2016. [Mr. Campbell] can be seen driving 114 mph with his lights and siren on and 109 mph with his lights and siren off. [Mr. Campbell] testified that he was responding to a call involving an officer fight.

Lieutenant Joel's Investigative Findings Report was admitted as Exhibit 14 to the ALJ hearing. In the report, Lieutenant Joel explained that he reviewed random samples (dating back to January 26, 2016) from Mr. Campbell's in-car recording system. The videos referenced by the ALJ and Lieutenant Joel were entered as Exhibit 23 to the ALJ hearing. We have reviewed Exhibit 23 and agree with the ALJ's findings. Several of the videos show Mr. Campbell driving recklessly and at speeds in excess of 100 miles per hour, all without activating the vehicle's emergency equipment. The videos also show Mr. Campbell passing vehicles on the right side, on a curve, and over a double-yellow line.

During his disciplinary hearing, Mr. Campbell admitted that his speeds were "a bit" extreme. When asked if he could expand on that point, he stated that he could not. After the video evidence was shown at the disciplinary hearing, Mr. Campbell testified, in part:

**Q:** The reason I wanted to watch it was you said that you thought your speeds were "a bit" excessive; would you like to revisit that at all now?

**A:** No sir.

**Q:** Did you see the speeds on there?

**A:** Yes sir, it was over 100 mph at some points.

*** 

**Q:** What are those speed [limits] generally in [the areas in the video]?

**A:** I don't recall what speeds are downtown, usually it's 45-50 mph.

**Q:** And what were your speeds?

**A:** 100.

**Q:** And I don't mean to beat you up . . . but you consider that "a bit" excessive?

**A:** Yes sir.

**Q:** If you were to encounter this same set of circumstances again, what if any of your behavior would you change?

**A:** The speed?

**Q:** And how much would you change the speed?

**A:** That's a very good question.

**Q:** It's an important question because if I allow you to keep working you're going to have to drive to calls again, so what would you drive these speeds as?

**A:** Much safer for the roads . . . .

**Q:** So give me a speed.

**A:** With my blue lights and sirens on? I probably shouldn't have exceeded 80 mph on the wider roads.

During his testimony before the ALJ, Mr. Campbell explained that he drove at excessive speeds because he was responding to "priority one" calls that were sometimes very far away from his location. Specifically, he stated:

> The reasons for my speed—I try to put myself in the caller's shoes or in the shoes of the officers that are on the other side of that radio screaming for help, that they were in a fight. They don't need me there in ten minutes, they needed me there five minutes ago. They needed—I should've already been there before they—before the situation went sour. That would be a good reason for the speed.

In its findings, the ALJ concluded that

> 21. [Mr. Campbell] admitted to violating the OPS-1 on each occasion in question. He ha[d] already received the most severe OPS-1 discipline in recent years by way of his 7 day suspension. No officer ha[d] been terminated for violation of the OPS-1 policy alone.

***

> 23. [Mr. Campbell] testified that in many cases he was responding to what he believed to be an emergency. Every video that was played at the appeal hearing was a response to a priority one call, a call that is high priority for any officer available at the time. Even though [Mr. Campbell] was not dispatched to the calls in question, he is entirely within his role to respond. This is [a] strong quality of an officer who constantly avails himself to those who need help. However, he must respond within the proper purview of the OPS-1 policy.

> 24. After [Mr. Campbell]'s counseling session, his driving improved to some degree. The improvement in [Mr. Campbell]'s driving does not, however, ameliorate his previous OPS-1 violations.

> 25. . . . Chief Fletcher ha[d] a reasonable basis to sustain the OPS-1 violations.

On appeal, the trial court determined that "the ALJ reached a reasonable conclusion based on the evidence." Following our review, we agree that there is substantial and material evidence that Mr. Campbell violated OPS-1. In addition to the video evidence, Mr. Campbell admitted that he violated OPS-1 on numerous occasions. Although he attempted to explain these violations by explaining that he was trying to come to the aid of his fellow officers, OPS-1 requires not only that an officer respond to calls "quickly," but also that he or she respond as "safely as possible with due regard to

public safety." It is the "safely" and "with due regard to public safety" criteria that Mr. Campbell breached. Although, at the ALJ hearing, Mr. Campbell testified that after the September 16, 2016 meeting with Lieutenant Joel, he slowed his speed and used his blue lights and siren, the ALJ found that "[t]he improvement in [Mr. Campbell]'s driving does not . . . ameliorate his previous OPS-1 violations." We agree. The video evidence of Mr. Campbell's operation of his police vehicle is undisputed, and it undeniably shows a pattern of reckless and unsafe driving by Mr. Campbell. The video provides substantial and material evidence to support the ALJ's finding that Chief Fletcher had a reasonable basis to sustain the OPS-1 violations.

## C. Termination of Employment

Having determined that there is sufficient evidence to support the ALJ's findings that Mr. Campbell violated both ADM-16 and OPS-1, we turn to the question of whether these violations warranted the termination of Mr. Campbell's employment.

At the ALJ hearing, Chief Fletcher explained how he determined to terminate Mr. Campbell's employment:

> [T]he ultimate decision I have to make is what intervention do I feel confident will prevent dangerous-type behavior in violation of policy from occurring again. And additionally, what—if an employee is retained—will contribute to a positive change in behavior of performance and conduct.

> ***

> [concerning termination of Mr. Campbell's employment,] [b]ecause of the previous administration of discipline and significantly similar incidents. That, combined with what appeared to be a clear lack of understanding of both the physics around the operation of [a] motor vehicle and the law surrounding the constitutional intervention of people's rights, layered upon no apparent understanding of the importance to change behavior, led me to believe that no discipline short of termination would change the behavior in a reliably positive manner to ensure [Mr.] Campbell's safety and the safety of our public.

The evidence supports Chief Fletcher's conclusion. Despite previous disciplinary actions and opportunities for improvement, Mr. Campbell continued to exhibit reckless and dangerous behavior. As noted by Chief Fletcher in his testimony before the ALJ, Mr. Campbell's disciplinary file was not sparse. In addition to the incidents discussed above, Chief Fletcher noted that CPD had previously investigated Mr. Campbell, under IA case number 2012-43, and found him guilty of conduct unbecoming and improper arrest stemming from Mr. Campbell's arrest of an individual for alleged obstruction of a

roadway and disorderly conduct (the charges were later dismissed). Following this 2012 incident, Mr. Campbell was given a 3-day unpaid suspension. He was also required to attend training to hone his interaction and de-escalation skills so as to better "interact with community members [and] to use language and relationships as opposed to force, arrest, and other intervention techniques."[6]

As discussed above, Mr. Campbell was also found guilty of OPS-1 violations in January 2016. At that time, he was suspended for 7 days and lost his FTO status. Yet, the car-dash video from Mr. Campbell's police vehicle shows that only 22 days after receiving the foregoing punishments, Mr. Campbell again violated OPS-1 by reckless operation of his assigned vehicle. At the ALJ hearing, Assistant Chief Tucker explained his frustration and concern that the previous punishment had no effect on Mr. Campbell's behavior, to-wit:

> **A:** I had concerns about [Mr.] Campbell's state of mind. Obviously he just received a significant amount of discipline to correct behavior and to ensure it doesn't happen again. In that short period of time, you're doing, you know, the same thing; driving at an excessive speed. It, it was a concern. I, I didn't know whether to think it was, you know, impulsive behavior or just flouting authority or, or what, but certainly it didn't seem to correct the behavior.

Similarly, Chief Fletcher testified:

> **Q:** In connection with the OPS-1 violations that you were considering on February 10th of 2017, why was it significant that [Mr. Campbell] had already been disciplined before for OPS-1 violations?
>
> **A:** Well, these are very similar. It was very similar behavior in nature – and I believe very firmly in progressive discipline, but I also believe in accountability to change your behavior based on discipline. So the fact that it was behavior that was very, very similar in nature and there had been disciplinary intervention and educational intervention and yet the same behavior repeated itself, caused me a great deal of concern.
>
> \*\*\*
>
> **Q:** Why was it a concern to you in 2017 when you had this hearing that [Mr. Campbell's reckless driving] was continuing to occur even after he had received disciplinary action?

---

[6] Chief Fletcher referenced the 2012 violations in his notice to Mr. Campbell, which terminated his employment (i.e. Exhibit 3 to the ALJ hearing).

**A:** Because it appeared that the discipline dispensed after the initial incident, the prior incident that I administered did not have the intended effect of changing the behavior in a positive manner.

During his testimony, Lieutenant Joel shared many of the same concerns that Assistant Chief Tucker and Chief Fletcher expressed and noted of particular concern was the fact that Mr. Campbell engaged in even more alarming driving behavior **after** his initial punishment for violation of OPS-1, i.e. Lieutenant Joel opined that "the judgment [Mr. Campbell] used in his driving habits is more alarming than that one event."

Furthermore, at his September 16, 2016 meeting with Mr. Campbell and his attorney, Lieutenant Joel asked Mr. Campbell "four questions to gauge [Mr. Campbell's] thinking to make a balanced assessment." These questions, Mr. Campbell's answers, and Lieutenant Joel's comments were attached as Appendix B to Lieutenant Joel's Investigative Findings Report:

1) *Are you aware of the policy governing vehicle operations, and what state law says about emergency vehicle operations?*

   Answer: "Yes, but I had only been suspended a few weeks before and old habits are hard to break."

2) *Do you need more training on the policy?*

   Initial Answer: "I think EVOC would have helped after that last suspension."[7] [Lieutenant Joel] reminded [Mr. Campbell] that he had in fact had EVOC during in-service [training] a matter of weeks after the suspension, and prior to this conversation. He recalled this and then answered "No," he did not need more training.

3) *Did you forget what the policy was?*

   [To clarify, [Lieutenant Joel] specified this was neither sarcastic nor rhetorical, but literal given the circumstances.]

   Answer: "No. But sometimes the policy is not at the forefront of my mind." As [Lieutenant Joel] took notes [Mr. Campbell] went on to say "My tactics are as safe as possible. I also hope my driving record speaks

---

[7] Lieutenant Joel testified at the ALJ hearing that "EVOC" stands for "Emergency Vehicle Operations Course." He further testified that police officers are required to have annual EVOC training to maintain their post-certification.

for itself since I haven't hit anything yet and anything hasn't hit me."[8]

4) *Then did you knowingly and willingly act contrary to the policy?*

Answer: "I never act contrary to policy. I know that policy is there to protect me, but I also have to protect my brother and sister officers."

Lieutenant Joel also asked Mr. Campbell "if there was anything more his supervisor could have done to help him with his behavior," and Mr. Campbell responded, "No." Nonetheless, at the ALJ hearing, Mr. Campbell testified that his supervisors were to blame for not properly explaining how he should correct his behavior after his first sustained OPS-1 violation, to-wit:

A: [W]hen I left my disciplinary hearing [in January 2016], no clear bar had really been set. They had simply just given me seven days off and sent me home, without my badge or my car keys.

When I came back, I considered that, you know, I needed to correct my behavior . . . [f]or example, the one where my vehicle made contact with the party in a parking lot at the gas station, I was driving in excessive speeds just to back up another unit that wasn't at that time in dire need of it. However, like I said, the bar had not been set.

\*\*\*

Q: . . . did you not state to Lieutenant Joel that apparently it hadn't been that long and old habits were hard to break . . . 22 days after you'd just been suspended for seven days?

A: That is what I stated to him, yes, sir.

Q: So seven days apparently couldn't break your habits?

A: I can—I would like to fall back on what I advised [my counsel], which was simply seven days was given to me, with no further instructions on how my driving habits needed to change. No further instruction and no additional training.

Contrary to Mr. Campbell's statements, both Assistant Chief Tucker and Captain Sutton testified at length regarding the additional training and counseling Mr. Campbell

---

[8] It is worth noting that Mr. Campbell hit a pedestrian prior to his statement that he has not "hit anything yet." His prior incident with a pedestrian is what led to IA case number 2015-24.

- 24 -

received after his first OPS-1 violation. Specifically, Chief Tucker testified:

> **A:** Well, I think that during [the January 2016 disciplinary hearing on Mr. Campbell's first OPS-1 violation], which I was of course involved in, it was stressed at that point to—not only to Officer Campbell, the chain of command that this needs to stop. And the actions were egregious. It put people in danger. It violates state law. We are not in an emergency vehicle if we don't have lights and sirens running. And were are not allowed to run or exceed the speed limits. . . . And that was made very clear at the hearing.

> **Q:** Okay sir. And at the earlier hearing had at least provided I guess monetary loss of pay and also a reduction in his ability to get I guess extra money as an FTO. Correct?

> **A:** Yes, sir.

> **Q:** Okay. And did you observe any change in behavior after that?

> **A:** Well, we had hoped—you know, seven days off is a significant amount monetarily and just a significant statement, I felt. And certainly the hope would have been that that would have changed that behavior. Unfortunately, we found that not to be the case, that the behavior did continue. It continued egregiously.

Likewise, Captain Sutton testified regarding her efforts to help correct Mr. Campbell's behavior after she reviewed the video of his driving from July 21, 2016:

> **A:** It was brought to our attention after [Mr. Campbell's] original discipline for driving offenses that his behavior had not corrected, and so we were tasked with reviewing video—not just his, but several officers' video to make sure that they were complicit with OPS-1. We found some items of concern, and it was my understanding that Lieutenant Joel first made contact with [Mr. Campbell] and advised him on his behavior and his driving habits. Also . . . I personally took it upon myself to visit the lineups and reiterate the importance of OPS-1 as well as some other policies that were in place on police behavior. I wanted to make sure that the information had been delivered not only to him, but the other officers, and that the information was repeated for at least a week.

In her disciplinary recommendation (Exhibit 17 to the ALJ hearing), Captain Sutton stated that Mr. Campbell had "a blatant disregard for policy, public safety[,] and his own [safety]." She recommended that Mr. Campbell be relieved of his driving privileges

indefinitely "due in part by his own admission that he's aware of policy, and indifferent to his training, policy and the ramifications of his actions."

Based on the foregoing evidence, the ALJ stated:

> [that he] [m]ust decide whether Chief Fletcher had a reasonable basis for his decision [to terminate Mr. Campbell's employment] at the time Chief Fletcher made the decision. Moreover, [CPD's] governing rules and policies give Chief Fletcher wide latitude regarding the level of discipline to be handed down up to and including termination. The . . . ALJ also considers all violations together when determining the reasonableness of Chief Fletcher's decision. Even though it was [determined] there was no reasonable basis for the harassment allegation, the allegations of false arrest and OPS-1 violations remain. Due to [Mr. Campbell]'s lack of self-control and related actions in the Hans[o]n Melvin incident and his admitted OPS-1 policy violations, it is [determined] that [CPD] has met its burden by a preponderance of the evidence that the termination was appropriate.

The trial court agreed with the ALJ, concluding that

> [a]s stated by the ALJ, the governing rules and policies of the Chattanooga Police Department give the Chief "wide latitude regarding the level of discipline to be handed down up to and including termination." The ALJ's Final Order carefully considers the facts and applies the law to the decision to uphold termination of [Mr.] Campbell. . . . Therefore, the [c]ourt cannot find that the ALJ reached an unreasonable decision, or that his decision was arbitrary and capricious.

We note that, CPD policy grants the Chief of Police wide discretion in fashioning discipline. For example, ADM-16 I (C) provides:

> Nothing in this order or in any other general order shall be interpreted to preclude or prohibit the Chief of Police from tailoring appropriate disciplinary action to fit the circumstances of any violation of policy, rule or order of the Department or any violation of policy, rule or order of the City. The Chief of Police may impose any level of disciplinary action authorized by the Chattanooga City Code.

Likewise, OPS-1 I (D)(2) provides:

> Notwithstanding anything herein to the contrary, the Chief of Police has the discretion to impose any level of discipline for a violation of the provisions of this order or to immediately suspend or revoke an employee's assigned

- 26 -

> vehicle privileges in appropriate circumstances. Penalties for violations of more than one of the provisions of this order may be more severe.

So, not only did Chief Fletcher have wide discretion to impose various levels of discipline for each of Mr. Campbell's policy violations, but the specific facts presented here clearly justify Chief Fletcher's discretionary decision to terminate Mr. Campbell's employment. As discussed in detail above, despite previous charges of policy violation and a concerted effort on the part of his supervisors to aid Mr. Campbell in modifying his behaviors, Mr. Campbell clearly did not avail himself of these opportunities. Rather, the record confirms that Mr. Campbell continued to act in a dangerous and reckless manner and to engage in the very same behaviors that led to previous disciplinary actions. Despite Mr. Campbell's protestations that he did not receive counseling and training sufficient to aid him in modifying his behaviors, as discussed above, the record simply does not support his contention. Mr. Campbell's violations of CPD policy were clearly explained to him, and he was given ample opportunity to change his dangerous driving habits and his confrontational approach to dealing with members of the community. Police officers are charged to protect and serve not to endanger and harass. Mr. Campbell's history with CPD, and his cavalier attitude concerning any change of behavior on his part, justifies Chief Fletcher's decision to remove Mr. Campbell from the police force.

## V. Conclusion

For the foregoing reasons, we affirm the trial court's order. The case is remanded for such further proceedings as may be necessary and are consistent with this opinion. Costs of the appeal are assessed against Appellant, David Campbell, for all of which execution may issue if necessary.

_____
KENNY ARMSTRONG, JUDGE